**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PHOENIX ENTERTAINMENT PARTNERS, LLC,<br><br>   Plaintiff,<br><br>v.<br><br>Robert Rysavy d/b/a M.I.B. Entertainment and Bellanca Inc., an Illinois Corporation<br><br>   Defendants. | Case No.: 15-cv-3059 |

**COMPLAINT**

  The Plaintiff, Phoenix Entertainment Partners, LLC ("PEP"), by its undersigned counsel, hereby complains of Defendants Rob Rysavy d/b/a M.I.B. Entertainment and Bellanca Inc., and for its Complaint hereby alleges as follows:

**JURISDICTION AND VENUE**

  1. This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

  2. This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.  This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in the State of Illinois and the United States District Court for the Northern District of Illinois.

5.  This Court has personal jurisdiction over each Defendant, in that each of them resides in this State and federal judicial district and conducts significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6.  Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7.  Defendant Robert Rysavy ("Rysavy") is an individual that does business as M.I.B. Entertainment and has provided karaoke entertainment to certain venues including Lamplighter Inn Tavern and Grill in Palatine, Illinois.

8.  Defendant Bellanca Inc. ("Bellanca") is an Illinois Corporation that operates a restaurant and music venue called Lamplighter Inn Tavern and Grill in Palatine, Illinois. Bellanca operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

**BACKGROUND FACTS**

9.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

10.     The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

11.     Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

12.     Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

13.     The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

14.     PEP is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

15.     PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

16.    Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

17.    SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

18.    The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

19.    SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

20.    Slep-Tone and its successor PEP have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

21.    Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

22.    In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

23.    In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

24.    The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

25.    Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

26.    Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

27.    Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

28.    In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

29.    That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

30.     That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

31.     For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

32.     The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

33.     The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

34.     Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

35.     This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

36.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

37.    None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

38.    Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

## THE RIGHTS OF THE PLAINTIFF

39.    PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

40.    PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

41.    PEP and its predecessor have, for the entire time its marks identified above ("the SOUND CHOICE Marks") have been federally registered, provided the public, including the Defendants with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

42.    PEP is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress"). This distinctive and protectable trade dress includes, at a

minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the SOUND CHOICE Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

43. PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

44. The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

45. The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by Rysavy and Bellanca are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the SOUND CHOICE Marks are also displayed.

46. The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

47. No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF ROBERT RYSAVY

48. Robert Rysavy ("Rysavy") provides karaoke services to various venues in Illinois, principally concentrated in the greater Chicago metropolitan area, including Lamplighter Inn Tavern and Grill operated by Defendant Bellanca Inc. ("Bellanca").

49. On information and belief, in order to provide services, rather than using original karaoke discs that he possesses (if he indeed possesses such discs), Rysavy relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

50. On information and belief, Rysavy relies upon at least one such computer hard drive described in paragraph 49 herein.

51. On information and belief, Rysavy created, or directed another to create, or otherwise acquired from a third party the files that are stored on his computer hard drive(s).

52. On information and belief, Rysavy does not maintain a 1:1 correspondence relationship between his hard drives and original discs he might have lawfully acquired.

53. PEP or Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Rysavy's computer hard drives at the time those files were so stored.

54. On information and belief, many of the files stored on the Rysavy's computer hard drives are representative of karaoke tracks originally created by Slep-Tone and are marked with the SOUND CHOICE Marks.

55. When played as intended using appropriate software, those files cause the SOUND CHOICE Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

56. Neither PEP nor Slep-Tone authorized Rysavy to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks or the Trade Dress.

57. As such, the placement of the SOUND CHOICE Marks and the Trade Dress upon Rysavy's computer files is a false designation of the origin of those computer files.

58.     At all times relevant to the causes of action stated herein, Rysavy has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks and/or the Trade Dress is not authorized.

59.     Rysavy's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

60.     A patron or unwitting customer of Rysavy, when confronted with the display of the SOUND CHOICE Marks and the Trade Dress at one of Rysavy's shows, is likely to be confused into believing, falsely, that Slep-Tone or PEP created the tracks in use or authorized their creation.

61.     Rysavy's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because he is paid to provide access to and play those computer files and tracks at karaoke shows.

62.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Rysavy is compensated and which inure to his benefit.

63.     On information and belief, Rysavy's piracy of accompaniment tracks is not limited to SOUND CHOICE tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

64.     The SOUND CHOICE Marks were displayed on video monitors during various songs played by Rysavy.

65.     PEP obtained photographs and videos of displays of the SOUND CHOICE Marks.

66.     Rysavy has not complied with PEP's MSP, and therefore his use of the SOUND CHOICE Marks were not authorized proper use.

## ACTIVITIES OF DEFENDANT BELLANCA INC.

67.     Bellanca hired Rysavy to provide commercial karaoke services at its bar.

68.     Bellanca has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

69.     PEP through its predecessor Slep-Tone or its representatives informed Bellanca of the infringing and counterfeit character of Bellanca's contractor's karaoke accompaniment tracks. *See* Exhibit A.

70.     PEP through its predecessor Slep-Tone offered Bellanca the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a free program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable PEP to assess whether those contractors are operating legally. *See id.*

71.     PEP also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

72.     As a result of PEP's efforts, through its predecessor Slep-Tone, Bellanca has actual knowledge of the infringing and counterfeit nature of Rysavy's karaoke materials.

73.     Despite that knowledge, Bellanca refused to terminate Rysavy's services.

74. Despite that knowledge, Bellanca continued to receive a financial benefit from the provision of infringing karaoke services at their establishments by Rysavy, through the attraction of paying patrons to their establishments.

75. As such, Bellanca operated in actual or apparent partnership with Rysavy, in a symbiotic relationship from which both benefit.

76. Bellanca is liable for the acts of trademark infringement directly engaged in by Rysavy on their respective premises or for their benefit.

## DAMAGES

77. Rysavy's unauthorized use of PEP's trademarks has damaged PEP. Rysavy has enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

78. Rysavy's illicit activities have also allowed him to compete unfairly against Slep-Tone's legitimate customers by lowering his cost of doing business through piracy of the music materials he uses.

79. Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Rysavy operates by helping to crowd higher-cost but legitimate operators out of the market.

80. Rysavy's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

81. Bellanca's unauthorized use of and benefit from the use of the SOUND CHOICE Marks have damaged PEP both in the aggregate and individually.

82. The Defendants have damaged PEP in an amount of at least $100,000.

83.     Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to PEP and to other manufacturers, the Defendants have cost PEP in excess of $100,000 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

## FIRST CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT
### AGAINST DEFENDANT ROBERT RYSAVY

84.     PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-83 of this Complaint.

85.     Rysavy used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

86.     Rysavy's use of the SOUND CHOICE Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

87.     PEP did not license Rysavy to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided at his venue(s).

88.     Use of the SOUND CHOICE Marks in the manner attributable to Rysavy is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which Rysavy performs into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

89.     Rysavy's acts were willful and knowing.

90.     PEP has been damaged by infringing activities of Rysavy.

91.     Unless enjoined by the Court, Rysavy's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
## AGAINST DEFENDANT ROBERT RYSAVY

92.     PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-91of this Complaint.

93.     On each occasion when Rysavy caused or permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Rysavy caused or permitted the display of the SOUND CHOICE Marks in connection with Rysavy's karaoke entertainment services.

94.     The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Rysavy's services and commercial activities.

95.     The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Rysavy for use in providing karaoke entertainment services.

96.     Rysavy's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Rysavy had legitimately acquired genuine SOUND CHOICE discs instead

of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

97.    Because PEP has been denied this revenue, it has been damaged by Rysavy's uses.

98.    On each occasion when Rysavy displayed an accompaniment track pirated from another manufacturer to be played during a karaoke show, Rysavy caused the display of the words, names, and symbols of the other manufacturer in connection with Rysavy's karaoke services.

99.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Rysavy acquired in a legitimate manner.

100.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Rysavy.

101.    Rysavy's use of the false designations of origin in this fashion damages PEP by enabling Rysavy to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

102.    The consequential denial of revenue from a legitimate market for  PEP's customers' services prevents Slep-Tone's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

103.     Because PEP has been denied this revenue, it has been damaged by Rysavy's false designations of origin relating to other manufacturers.

104.     Unless enjoined by the Court, Rysavy's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

### THIRD CLAIM FOR RELIEF
### ILLINOIS DECEPTIVE TRADE PRACTICES ACT
### AGAINST DEFENDANT ROBERT RYSAVY

105.     PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-104 of this Complaint.

106.     Rysavy used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

107.     Rysavy's acts of infringement occurred during the conduct of trade or commerce, from which Rysavy derived an economic benefit.

108.     Rysavy's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

109.     Rysavy's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

110.     As a direct and proximate result of each of Rysavy's acts of infringement PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those

discs, which revenue would have been received but for Rysavy's acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

111.  As such, PEP has been damaged and is likely to be further damaged by a deceptive trade practice of Rysavy within the meaning of 815 ILCS § 510/3.

112.  Unless enjoined by the Court, Rysavy's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT ROBERT RYSAVY**

113.  PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-112 of this Complaint.

114.  Rysavy used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

115.  Rysavy's use of the SOUND CHOICE Marks was "in commerce" within the meaning ascribed by Illinois common law.

116.  PEP did not license Rysavy to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided to its lounge.

117.  Use of the SOUND CHOICE Marks in the manner attributable to Rysavy is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which Rysavy

performs into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

118.    Rysavy's acts were willful and knowing.

119.    PEP has been damaged by infringing activities of Rysavy.

120.    Unless enjoined by the Court, Rysavy's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**FIFTH CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST  DEFENDANT BELLANCA**

121.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-120 of this Complaint.

122.    Bellanca knowingly directly benefited from the use of, and through Rysavy, used a reproduction, counterfeit, or copy of the SOUND CHOICE Marks in connection with the provision of karaoke entertainment services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the SOUND CHOICE Marks during the provision of those services.

123.    Bellanca's use of the SOUND CHOICE Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

124.    PEP did not license Bellanca to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks in connection with the services provided at its lounge.

125.    Use of the SOUND CHOICE Marks in the manner attributable to Bellanca is likely to cause confusion, or to cause mistake, or to deceive Bellanca's customers into believing

that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

126.    Bellanca's acts were willful and knowing.

127.    PEP has been damaged by infringing activities of Bellanca.

128.    Unless enjoined by the Court, Bellanca's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**SIXTH CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANT BELLANCA**

129.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-128 of this Complaint.

130.    On each occasion when Bellanca permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Bellanca permitted the display of the SOUND CHOICE Marks in connection with Rysavy's karaoke entertainment services.

131.    The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Bellanca's services and commercial activities.

132.    The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Rysavy for use in providing karaoke entertainment services in a venue of Bellanca's.

133.     Bellanca's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Rysavy had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

134.     Because PEP has been denied this revenue, it has been damaged by Bellanca's uses.

135.     On each occasion when Bellanca permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Bellanca permitted the display of the words, names, and symbols of the other manufacturer in connection with Rysavy's karaoke services.

136.     The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Rysavy acquired in a legitimate manner.

137.     The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold those manufacturers and purchased by Rysavy.

138.     Bellanca's use of the false designations of origin in this fashion damages PEP by enabling Bellanca, through Rysavy, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

139.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

140.    Because PEP has been denied this revenue, it has been damaged by Bellanca's false designations of origin relating to other manufacturers.

141.    Unless enjoined by the Court, Bellanca's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**SEVENTH CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**AGAINST DEFENDANT BELLANCA**

142.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-141 of this Complaint.

143.    Bellanca hired Rysavy to provide commercial karaoke services at its establishment, and it had the right and ability to control his use of authorized or counterfeit materials for said commercial purposes.

144.    Bellanca permitted Rysavy to engage in acts of infringement of the SOUND CHOICE Marks and the Trade Dress, in derogation of PEP's common law and statutory rights in those marks.

145.    Rysavy's acts of infringement occurred during the conduct of trade or commerce, from which Bellanca derived an economic benefit.

146.    Bellanca enabling Rysavy's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

147.    Bellanca enabling Rysavy's acts of infringement caused likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

148.    As a direct and proximate result of each of Rysavy's acts of infringement and Bellanca's encouragement thereof, PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Rysavy's acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

149.    As such, PEP has been damaged and is likely to be further damaged by a deceptive trade practice of Rysavy, aided by Bellanca's encouragement, within the meaning of 815 ILCS § 510/3.

150.    Unless enjoined by the Court, Rysavy's unfair competition activities, aided by Bellanca's encouragement, as described above will continue unabated and will continue to cause harm to PEP.


### EIGHTH CLAIM FOR RELIEF
### COMMON LAW UNFAIR COMPETITION
### AGAINST DEFENDANT BELLANCA

151.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-150 of this Complaint.

152.    On each occasion when Bellanca permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Bellanca permitted the display of the SOUND CHOICE Marks in connection with Rysavy's karaoke entertainment services.

153.    The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that PEP sponsored or approved Bellanca's services and commercial activities.

154. The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Rysavy for use in providing karaoke entertainment services in a venue of Bellanca's.

155. Bellanca's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Rysavy had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

156. Because PEP has been denied this revenue, it has been damaged by Bellanca's uses.

157. On each occasion when Bellanca permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, Bellanca permitted the display of the words, names, and symbols of the other manufacturer in connection with Rysavy's karaoke services.

158. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Rysavy acquired in a legitimate manner.

159. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to

be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Rysavy.

160.    Bellanca's use of the false designations of origin in this fashion damages PEP by enabling Bellanca, through Rysavy, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

161.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

162.    Because PEP has been denied this revenue, it has been damaged by Bellanca's false designations of origin relating to other manufacturers.

163.    Unless enjoined by the Court,  Bellanca's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PEP prays for judgment against Robert Rysavy d/b/a M.I.B. Entertainment and Bellanca Inc. that the Court:

A.    Find that Rysavy and Bellanca committed acts of infringement, including but not limited to counterfeiting, of the federally registered SOUND CHOICE Marks and of the Trade Dress;

B.    Find that Rysavy and Bellanca engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.    Enter judgment against Rysavy and Bellanca and in favor of PEP on all applicable counts;

D.      Find the activities of Rysavy and Bellanca were in all respects conducted willfully and for profit;

E.      Award to PEP the profits of Rysavy and Bellanca and the damages sustained by PEP because of the conduct of Rysavy and Bellanca in infringing the SOUND CHOICE Marks, the SOUND CHOICE Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

F.      Award to PEP the profits of Rysavy and Bellanca and the damages sustained by PEP because of Rysavy's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

G.      Award to PEP treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $100,000 from each of the venue Defendants;

H.      Grant PEP preliminary and permanent injunctive relief against further infringement of the SOUND CHOICE Marks by Rysavy and Bellanca;

I.      Award PEP its costs suit and attorney fees, to the extent not awarded above; and

J.      Grant PEP such other and further relief as justice may require.

Respectfully Submitted,

/s/ Vivek Jayaram, Esq.
Vivek Jayaram, Esq.
Jayaram Law Group, Ltd.
33 N. LaSalle Street
Suite 2900
Chicago, IL 60602

vivek@jayaramlaw.com
Tel: 312.454.2859
Fax: 312.551.0322
Counsel for the Plaintiff